## UNDERWOOD v UNDERWOOD

Docket No. 96206. Submitted August 5, 1987, at Detroit. Decided
September 22, 1987.

In November, 1983, Robert A. Underwood filed a complaint for
divorce from Christine Underwood in Wayne Circuit Court,
seeking permanent custody of the child of that marriage,
Brandon, born August 19, 1983. Plaintiff was granted custody
of Brandon by an ex parte interim order. Plaintiff and Brandon
left the marital home briefly in November, 1983, and perma-
nently in May, 1984. Defendant filed a counterclaim for divorce
in February, 1984, seeking permanent custody of Brandon and
a modification of the ex parte order. Following an evidentiary
hearing in September, 1986, the circuit court, Robert B. Brzez-
inski, J., entered a judgment of divorce which granted perma-
nent custody to defendant. Plaintiff appealed.

The Court of Appeals *held:*

A remand for further findings by the circuit court is re-
quired, since the circuit court failed to make a finding as to
whether an established custodial environment existed for Bran-
don with plaintiff. Only upon a determination of whether an
established custodial environment existed can the proper stan-
dard of review be determined.

Remanded.

PARENT AND CHILD — CHILD CUSTODY — ESTABLISHED CUSTODIAL
ENVIRONMENT — FINDINGS OF FACT — APPEAL.

Error mandating remand for further findings occurs where the
circuit court in a child custody matter fails to make a specific
finding as to whether an established custodial environment
exists with the custodial parent and there is not an adequate
record from which the Court of Appeals can make a determina-
tion whether an established custodial environment existed,
since the existence or nonexistence of an established custodial
environment is determinative of whether appellate review is to

REFERENCES

Am Jur 2d, Parent and Child §§ 23 *et seq.*

Power of court, on its own motion to modify provisions of divorce
decree as to custody of children, upon application for other relief.
16 ALR2d 664.

be under the clear and convincing evidence standard or the preponderance of the evidence standard (MCL 722.27; MSA 25.312).

*Robert E. Greenstein,* for plaintiff.

*Hyman, Gurwin, Nachman, Freidman & Winkelman* (by *Denise R. Alexander* and *Thomas J. DelPup*), for defendant.

Before: SHEPHERD, P.J., and HOOD and T. M. BURNS,* JJ.

PER CURIAM. Plaintiff father appeals as of right from the October 15, 1986, judgment of divorce entered in Wayne Circuit Court, granting custody of the parties' minor child to defendant wife. We remand for further proceedings.

Plaintiff and defendant were married on December 23, 1982. One child was born of this marriage, Brandon, born August 19, 1983. Plaintiff and Brandon left the marital home briefly in November of 1983 and permanently in May of 1984. Plaintiff filed a complaint for divorce in November, 1983, requesting permanent custody of Brandon. An ex parte interim order granted plaintiff temporary custody of Brandon and reasonable visitation to defendant and ordered defendant to pay plaintiff weekly child support in the amount of $45. Defendant apparently never made any child support payments nor did plaintiff pursue child support. On February 17, 1984, defendant filed a counterclaim for divorce in which she sought permanent custody of Brandon and requested modification of the ex parte interim order. However, defendant did not pursue the modification for a period of

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

time, apparently under the impression that divorce proceedings had been dropped. Some two years later, on June 6, 1986, defendant made a motion for immediate change of interim custody or for specific visitation. An order was entered affirming plaintiff's temporary custody of Brandon and granting defendant specific visitation. Psychological evaluations were also ordered of the parties, Brandon, plaintiff's mother and defendant's two minor daughters from her previous marriage. Defendant's two minor daughters, Courtney and Tiffany, lived with defendant. At the time of the divorce hearing, Courtney was eleven years old and Tiffany was eight years old.

A hearing on the complaints for divorce was conducted in September, 1986. The brief marriage was marked by discord. Plaintiff father testified that he left the marital home for several days in November, 1983, with Brandon when Brandon was three months old. He returned, but left again for a brief period of time. Plaintiff and Brandon left permanently in May, 1984, after an argument between plaintiff and defendant. Plaintiff had custody of Brandon until the judge granted custody to defendant following the September, 1986, hearing, a period of approximately 2½ years. Plaintiff and Brandon lived with plaintiff's mother, stepfather and sisters at plaintiff's mother's house in Garden City during this 2½-year period.

Plaintiff has had something of a sporadic work history. When the couple was first married plaintiff worked in a nursing home. He was fired for tardiness. He subsequently worked as an orderly in another nursing home, a stocker in a grocery store and as a maintenance man. At the time of trial plaintiff was working as a substitute custodian for the Plymouth school system and had been with the system for 1½ years. He had been work-

ing a forty-hour week since June, 1986, and brought home approximately $150 per week net.

Plaintiff indicated that he generally worked the afternoon shift, 3:00 P.M. to 11:00 P.M., so that he could care for his son during the day. Plaintiff indicated that his wife returned to work one month after Brandon's birth and, since he did not start work until 6:00 P.M. at that time, he had been Brandon's primary caretaker since that time. Both plaintiff's mother, Carolyn Rubin, and sister, Kathy Borromeo, testified that plaintiff was a fine father who had cared for Brandon, toilet trained the boy and spent most of his daytime hours with his son. Plaintiff has also taken Brandon for tests regarding Brandon's slow speech development. Plaintiff also apparently has a good relationship with Courtney and Tiffany and included those children in activities also.

Nonetheless, Rubin indicated that plaintiff and Brandon would have to move soon to their own home, when things "settled." Plaintiff and Rubin indicated that plaintiff's father, one of Rubin's ex-husbands, would help plaintiff purchase a house. Plaintiff's father did not testify, however. Rubin also testified that she put Brandon to bed when plaintiff was at work and that she fixed the household meals. She, of course, babysat while plaintiff was not at home.

There was a significant amount of testimony indicating that the parties' marriage was characterized by arguments. These arguments apparently centered on money, plaintiff's failure to maintain steady employment and what defendant claimed was interference from plaintiff's family. Plaintiff testified to several incidents in which defendant attacked him physically. However, the clinical psychologist called to examine the parties in this

case, John Francisco, attributed these outbursts to plaintiff's emotional baiting of defendant.

The testimony relative to defendant indicated that she was a good mother, a good housekeeper and held a steady job at Livonia's St. Mary's Hospital. Thomas Wendt, father of Courtney and Tiffany, testified that he was satisfied with the job of mothering defendant had done with his daughters and testified to no visitation problems. Defendant admitted to having a quick temper. Her ex-husband testified that she was emotional but only displayed verbal, and not physical, signs of anger while they were married.

The record indicates that after plaintiff and Brandon moved to plaintiff's mother's house defendant was a regular visitor there. Testimony at the hearing indicated that defendant sought to reconcile with plaintiff by visiting the Rubin home and discussing the situation with plaintiff and plaintiff's mother. The record indicates the defendant was almost a daily visitor.

Defendant fed and visited with Brandon at Rubin's house, although the record does not reflect the amount of time defendant actually spent with Brandon and the nature of her relationship with the child during this period, and these matters were not the subject of findings by the trial court. Additional evidence on these matters would aid both the trial and appellate court in determining whether the number and quality of defendant's visits balanced the significance of Brandon's relationship with his father.

There is also some indication in the record that plaintiff controlled and limited defendant's ability to visit with Brandon. The record indicates that defendant was not allowed to take Brandon out of the Rubin home without plaintiff's permission. In the spring of 1986 defendant learned that divorce

proceedings were still pending. According to defendant, she came to the realization that reconciliation was futile, and she visited the Rubin household less frequently thereafter. Rubin and defendant had a falling out in June, 1986, when Rubin, pursuant to plaintiff's instruction, refused to allow defendant to take Brandon out when plaintiff was away. This was despite the fact that plaintiff and defendant had previously discussed defendant's taking Brandon overnight. Defendant had no contact with Rubin after this point. In her interview with Dr. Francisco, she indicated that she feared that both plaintiff and plaintiff's mother would attempt to turn Brandon against her. Indeed, Dr. Francisco noted a great deal of bitterness toward defendant in his interview with Carolyn Rubin.

The psychologist's report seemed to weigh heavily with the trial court, and Dr. Francisco's recommendation was to grant custody to defendant. Dr. Francisco's report indicated that defendant's Minnesota Multiphase Personality Inventory profile was within normal limits. Defendant revealed that she had been severely depressed several years before, after the breakup of a long-term relationship, and she had undergone psychiatric therapy. She was seeing a psychologist at the time of the interview to help her deal with the stress of the divorce.

The doctor noted that defendant could provide a home for Brandon, while plaintiff was dependent on his parents for a home. He concluded that both parents appeared to be morally, mentally and physically fit. Both parents had weaknesses in their personality. Defendant appeared to be aware of her weak areas and was willing to improve herself. Plaintiff was not aware of his weak areas and, Dr. Francisco concluded, plaintiff had difficulty assessing the role he played in creating

conflict. He also found defendant's work record more favorable. Finally, he concluded that defendant was more interested in facilitating a relationship between plaintiff and Brandon than plaintiff was in fostering a relationship between defendant and Brandon.

Although a possible change of custody was at issue, the trial court made no finding as to whether an established custodial environment existed. MCL 722.27(c); MSA 25.312(7)(c). The trial court, in granting custody to defendant, expressed its findings on each of the statutory best interest factors. MCL 722.23; MSA 25.312(3).

With this factual basis we now turn to the legal issues in this case.

I

The dilemma we face in this case results from the trial court's failure to make a finding as to whether an established custodial environment existed. Such a failure will often require a remand to the lower court. See *Wealton v Wealton,* 120 Mich App 406; 327 NW2d 493 (1982). However, this Court may exercise its power of de novo review in child custody matters and make its own determination whether an established custodial environment existed where the lower court record permits. *Meyer v Meyer,* 153 Mich App 419, 423; 395 NW2d 65 (1986); *Arndt v Kasem,* 135 Mich App 252; 353 NW2d 497 (1984).

MCL 722.27(c); MSA 25.312(7)(c) provides in pertinent part:

The court shall not modify or amend its previous judgments or orders or issue a new order so as to challenge the established custodial environment of a child unless there is presented clear and convinc-

ing evidence that it is in the best interest of the child.

Thus, if the trial court had determined that an established custodial environment existed, defendant would have been obliged to establish by "clear and convincing" evidence that the best interests of the child rested with custody in her. If no established custodial environment is established, custody is determined by a preponderance of the evidence standard. *Lewis v Lewis,* 138 Mich App 191; 360 NW2d 170 (1984).

In determining whether an established custodial environment existed, our inquiry begins with the above-cited statute, which, in pertinent part, provides:

> The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. [MCL 722.27(c); MSA 25.312(7)(c).]

In *Baker v Baker,* 411 Mich 567, 579-580; 309 NW2d 532 (1981), the Michigan Supreme Court reviewed this statutory language:

> Such an environment depended instead upon a custodial relationship of a significant duration in which [the child] was provided the parental care, discipline, love, guidance and attention appropriate to his age and individual needs; an environment in both the physical and psychological sense in which the relationship between the custodian and the child is marked by qualities of security, stability and permanence.

In *Baker,* a son, Arthur Lee, was born to the parties in August, 1970. The parties had another child, Sharyll Anne, who was a product of defendant wife's previous marriage. From the time of Arthur's birth and until June, 1978, the two children lived with their parents in the marital home in the area of Alpena, Michigan. In June, 1978, defendant wife took the children to Colorado on vacation. Upon returning she informed plaintiff father that she wanted a divorce. Plaintiff filed for divorce. Subsequently the parties agreed that defendant could take the children to Colorado and take up residence. A month later plaintiff appeared unannounced in Colorado and returned to Alpena with Arthur Lee. Plaintiff and Arthur Lee stayed with plaintiff's parents upon returning for the seven-week period prior to the divorce hearing. The Supreme Court found no established custodial environment, although the Supreme Court conceded the importance of the long-term community contacts. Nonetheless, the Court found the repeated geographic and custodial changes and attendant emotional turmoil so significant that it voided the significance of the long-term community contact. The Court also noted that plaintiff father intended to find a new residence after the custodial determination. 411 Mich 581.

Other recent cases in this Court suggest that a decision on whether an established custodial environment exists depends on the specific facts in a particular case. In *Schwiesow v Schwiesow,* 159 Mich App 548; 406 NW2d 878 (1987), this Court found an established custodial environment where the children had lived all their lives on a family farm except for a two-month stay with the appellant mother. In *Breas v Breas,* 149 Mich App 103; 385 NW2d 743 (1986), we affirmed a trial court's finding that no established custodial environment

existed where the mother had physical custody, pending a divorce, but where the father exercised frequent visitation, was seeking permanent custody and the environment provided for the child was not permanent. In *Curless v Curless,* 137 Mich App 673; 357 NW2d 921 (1984), this Court affirmed a trial court's finding of no established custodial environment where the children were staying with the mother pending a divorce, but the father exercised frequent visitation and was seeking permanent custody in the divorce proceedings.

Unfortunately, on the present record, we cannot make a determination whether an established custodial environment was or was not established. In the instant case, plaintiff had had physical custody for over two of the three years of the child's life at the time of the hearing. That, of course, is a period of some significant duration. Plaintiff had custody pursuant to a temporary court order, but that in and of itself is not enough to establish an established custodial environment. See *Baker, supra,* pp 579-580; *Breas, supra.* However, plaintiff and Brandon resided in the paternal grandmother's home, an arrangement both plaintiff and Rubin testified was temporary. Unfortunately plaintiff is entirely dependent on this arrangement, given his income. Furthermore, plaintiff is dependent on his mother for child care. In any event, plaintiff claimed to have plans to get his own home in the future. In other words, the living arrangements at the time of the hearing seemed plainly temporary.

On the other hand, we note that the record indicates plaintiff is a loving father who works a late shift in order to attend to his son. We note that the child had been in a single physical environment for most of his life and that his most significant relationship, at least in terms of time

spent together, appears to have been the father-son relationship.

Defendant, on the other hand, has her own home. Defendant wife had been an almost daily visitor in the Rubin home during the period plaintiff and Brandon resided there. She attempted to reconcile with plaintiff and attempted to get along with her mother-in-law. She had frequent contact with Brandon during these visits. Only upon concluding that reconciliation was futile did defendant go forward with divorce and custody proceedings in an effort to obtain permanent custody. In other words, the custody situation continued, in part, pending defendant's reconciliation efforts. We note that plaintiff has sought to control and limit defendant's ability to be with her son.

Unfortunately many questions relevant to whether an established custodial environment existed remain. We do not know, for instance, whether the child looked primarily to his father as the main source for discipline and guidance or whether that role was divided between plaintiff, defendant and Mrs. Rubin. We cannot, with certainty, say whether the child looked to plaintiff alone for the necessities of life or whether that role too was divided. We would also be interested to know how often, and for how long, Brandon went on overnight visits to defendant's home. Nor is the record clear on the nature of the mother-child relationship during defendant's frequent visits to Rubin's home. In short, we cannot determine whether an established custodial environment did or did not exist on de novo review of the existing record. Therefore we find that the trial court made a clear legal error on a major issue and therefore the case must be remanded. MCL 722.28; MSA 25.312(8).

The first step in considering a change in custody

is to determine whether an established custodial environment existed. Such a determination is necessary so that the court can apply the appropriate burden of proof. *Curless, supra,* p 676. Failure to make such a determination places the appellate court in the quandary which we face in this case.

This, of course, is not the first case, nor the last, in which the trial court has failed to make findings on the issue. See *Hoke v Hoke,* 162 Mich App 201; 412 NW2d 694 (1987). In the future, in cases of this type, we ask that the trial court: (1) make an on-record finding as to whether an established custodial environment existed; (2) based on that finding, set forth the appropriate burden of proof; and (3) apply the appropriate burden of proof to the best interest factors.

Furthermore, we would urge counsel to step forward in the event the trial court inadvertently fails to follow the statutory requirements. In this case counsel were both sophisticated and professional. We are unsure whether counsel failed to get a definitive ruling as a matter of trial strategy or whether the oversight was inadvertent. Nonetheless, counsel should conduct the child custody hearing in a way which will aid appellate review, not defeat it.

II

Plaintiff also argues that the trial judge's findings in assessing the best interests of the child was against the great weight of the evidence. Although the trial court found in favor of defendant by a clear and convincing standard on two of the best interest factors, it appears to us that the trial court applied the preponderance standard overall. Again, the trial court was not specific. If, upon review, the trial court finds no established custo-

dial environment, plaintiff's argument is without merit. Although review of the trial court's findings in a custody case is de novo, this Court is bound to affirm the trial court's findings unless they are against the great weight of the evidence. MCL 722.28; MSA 25.312(8). The trial judge applied all the factors required for a determination of the best interests of the child as detailed in MCL 722.23; MSA 25.312(3). Our review of the record reveals that the trial judge's findings as to each of the statutory factors was supported by the evidence presented at the hearing and the psychological evaluation performed for the court. On two of the factors the trial court found defendant superior by clear and convincing evidence. We can find no error.

If the trial court finds that an established custodial environment *did* exist it will be required to apply the clear and convincing standard to the evidence. If no established custodial environment existed, the findings of the trial court were supported by a preponderance of the evidence.

Remanded. We do not retain jurisdiction.